STATE v. WILLIAMS.

1. A and B being jointly indicted for murder, A was first tried and con-
victed. B being then put upon his trial, three jurors who had served
on the petit jury which convicted A, were presented to the prisoner
after he had exhausted his peremptory challenges. B objected to them
upon the ground that they had served on the jury in A's case, but
they having declared on their *voir dire* that they had formed no opin-
ion as to B's guilt or innocence, and were sensible of no bias or preju-
dice in the matter, the trial judge ordered the three jurors to be sworn.
Was this legal error?

2. A juror being called in B's case who had testified as a witness in A's
case, the trial judge of his own motion, without any examination on
the juror's *voir dire*, declared this juror to be prejudiced, and ordered
him to stand aside. This was error.

3. The trial judge having in his charge so commented upon the facts as to
indicate to the jury that he thought the prisoner was guilty and should
be convicted, the charge was obnoxious to section 26 of article IV., of
the Constitution, and the prisoner is therefore entitled to a new trial.
MR. JUSTICE McGOWAN concurred in the result.

Before PRESSLEY, J., Darlington, March, 1889.

The opinion fully states the case.

*Mr. E. O. Woods*, for appellant.

*Mr. Johnson*, solicitor, contra.

July 6, 1889.    The opinion of the court was delivered by

MR. CHIEF JUSTICE SIMPSON.    For a full understanding of
this case, the opinion is preceded by a statement of the case; the
indictment; the empanelling of the jury; the charge of his honor,
Judge B. C. Pressley; and the exceptions of appellant, as fol-
lows:

"STATEMENT OF CASE.

"The defendant, Lewis Williams, and his co defendants, Joseph
W. James, William Scott, and Robert Arthur, were jointly in-
dicted for the murder of Joseph James, sr., upon three counts, as
the indictment will disclose.    At the preceding term of the court

for Darlington County, to wit, at the June term, 1888, Judge Fraser presiding, the defendants, Lewis Williams, Joseph W. James, and William Scott, were arraigned, and each of them pleaded 'not guilty.' On the motion of the defence, Judge Aldrich, at the October term, granted a severance; and subsequently, on the motion of the solicitor, continued the cases until the next term of the court.

"The case came on for trial at the March term of the Court of Sessions, when the defendants, James and Williams, were separately tried and were both convicted, the defendant Scott, an alleged accomplice in both cases, testifying on behalf of the State, and in his testimony admitted his own guilt, and testified further to a conspiracy between himself and his co'defendants for the murder of the deceased. No disposition having been made of the case against Scott, upon a trial of the defendant, Lewis Williams, three of the jurors who composed the jury in the trial of Joseph W. James served upon the jury in the trial of Williams. The defendant having challenged for cause all the jurors who served in the trial of James, and being overruled, challenged them peremptorily, his peremptory challenges being exhausted when the said three jurors were called and sworn. The method of empanelling the jury is inserted in the case.

"The following constitutes the indictment in the case:

"THE STATE OF SOUTH CAROLINA, }
    "County of Darlington. }

"At a Court of General Sessions begun and holden in and for the County of Darlington, in the State of South Carolina, at Darlington, in the County and State aforesaid, on Monday, the day of March, in the year of our Lord one thousand eight hundred and eighty eight. The jurors of and for the said County of Darlington aforesaid, in the State of South Carolina aforesaid, that is to say, upon their oaths present that William Scott, Lewis Williams, Robert Arthur, and Joseph W. James, on the eighth day of May, in the year of our Lord one thousand eight hundred and eighty-eight, with force and arms at Darlington, in the County of Darlington, State aforesaid, in and upon one Joseph James, sr., feloniously, wilfully, and of their malice aforethought,

made an assault, and him, the said Joseph James, sr., with a gun did shoot and wound, giving to him, the said Joseph James, sr., then and there, by means of the said shooting in and upon the body of him, the said Joseph James, sr., one mortal wound, of which said mortal wound the said Joseph James, sr., then and there instantly died. And so the jurors aforesaid do say that the said Joseph W. James the said Joseph James, sr., in manner and form aforesaid, feloniously, wilfully, and of his malice aforethought, did kill and murder, against the form of the statute in such case made and provided, and against the peace and dignity of the State.

"And the jurors aforesaid, upon their oaths aforesaid, do further present that the said Lewis Williams, on the eighth day of May, in the year of our Lord one thousand eight hundred and eighty-eight, with force and arms, at Darlington, in the County of Darlington, State aforesaid, in and upon one Joseph James, sr., feloniously, wilfully, and of their malice aforethought, did make an assault and him, the said Joseph James, sr., with a gun did shoot and wound, giving to him, the said Joseph James, sr., then and there, by means of said shooting in and upon the body of him, the said Joseph James, sr., one mortal wound, of which said mortal wound the said Joseph James, sr., then and there instantly died. And so the jurors aforesaid do say the said Lewis Williams the said Joseph James, sr., in manner and form aforesaid feloniously, wilfully, and of his malice aforethought did kill and murder.

"And the jurors aforesaid, upon their oaths aforesaid, do further present that Joseph W. James, William Scott, and Robert Arthur, late of the county aforesaid, before the said felony and murder was committed, in form aforesaid, to wit, on the second day of May, in the year aforesaid, at Darlington, in the county aforesaid, did feloniously and maliciously incite, move, procure, aid, counsel, hire, and command the said Lewis Williams the said felony and murder in manner and form aforesaid, to do and commit against the form of the statute in such case made and provided, and against the peace and dignity of the same State aforesaid."

"When the jury was being empanelled, the juror, T. P. King,

was called to the book, whereupon the defendant's counsel challenged the juror upon the ground that this juror had served upon the panel which tried the case against Joseph W. James, and that the defendant, Lewis Williams, was charged in the indictment as a co-conspirator with James. The presiding judge ordered the juror to be sworn upon his *voir dire*. This was done, and the juror having answered satisfactorily the questions propounded to him, was declared by the presiding judge to be a competent juror and ordered to be presented to the defendant. The defendant excepts.

"When the juror, E. R. Moore, was called, the defendant's counsel challenged the juror for the same cause. He was sworn upon his *voir dire*, and having answered satisfactorily to the court the questions propounded to him, he was declared by the presiding judge to be a competent juror and was ordered to be presented to the defendant. Defendant excepts.

"When the juror, S. E. Moore, was called, the defendant's counsel challenged the juror for the same cause. He was ordered by the presiding judge to be sworn upon his *voir dire*. This was done. and the juror having answered satisfactorily to the court the questions propounded to him, he was declared by the presiding judge to be a competent juror, and ordered to be presented to the defendant. Defendant excepts.

"When the juror. J. M. King, was called, the defendant's counsel challenged the juror for the same cause. The juror was ordered to be sworn upon his *voir dire*. This being done, and the juror failing to answer satisfactorily to the presiding judge the questions propounded to him, he was declared to be not a competent juror, and ordered not to be presented to the defendant.

"When the juror, A. M. Lee, was called, the defendant's counsel challenged the juror for the same cause. The juror was ordered to be sworn upon his *voir dire*. This being done, and the juror having answered satisfactorily to the court the questions propounded to him, he was declared by the court to be a competent juror and ordered to be presented to the defendant. The solicitor challenged this juror.

"When the juror, P. A. Parnell, was called, the defendant's

counsel challenged the juror for the same cause. The juror was sworn upon his *voir dire*, and having answered satisfactorily the questions propounded to him, was declared by the presiding judge to be a competent juror, and ordered to be presented. Defendant excepts.

"When the juror, W. C. Ervin, was called, defendant's counsel challenged the juror for the same cause. The juror was sworn upon his *voir dire*, and having satisfactorily answered the questions propounded, was ordered to be presented. Defendant excepts.

"When the juror, ———— Polson, was called, the defendant's counsel challenged the juror for the same cause. The juror was sworn upon his *voir dire*, and failing to satisfactorily answer the questions propounded, he was declared by the presiding judge to be not a competent juror.

"When the juror, J. A. Huggins, was called, the presiding judge said : I heard his testimony in the other case, and I do not regard him as a person without prejudice. I was not at all satisfied with his talking with the witnesses at the hotel door. The juror was ordered not to be presented to the defendant. The defendant excepts.

"When the jurors, John T. Rogers, W. S. McIntosh, and ———— Barrington, were each called, the defendant's counsel challenged each for the same cause. Each juror was sworn upon his *voir dire*, and each juror having answered satisfactorily the questions propounded, was declared by the presiding judge to be a competent juror, and presented to the defendant. Defendant excepts.

"The defendant's peremptory challenges having been exhausted before the last named three jurors were called, they were sworn upon the jury.

### "JUDGE'S CHARGE.

"MR. FOREMAN AND GENTLEMEN : There have been so many details in this case that I do not consider necessary to call your attention to, and which may have tended to divert your attention from the true issues of the case, that I will endeavor precisely to call your attention to the true issues which you are to try. Well,

first, you are not to try whether Lewis Williams shot that gun, or who shot it. That is not a material issue in the case in so far as his legal guilt is concerned. It is a question when you come to consider the question of William Scott's testimony, but it is not one of the legal issues in the case ; because the law is this : that whether he shot the gun, or whether he was on the watch, present on the watch, it is just the same. The law is this : that the man who kills and the man who stands on the watch to keep him from being surprised when he is going to kill, the offence is the same in law. If two or more persons go together to kill a man, the finger of the man that is on the trigger is the finger of all. So you will not try that issue at all. You are to try whether he took part in that killing, either by shooting the gun or by being on the watch—being there to encourage, aid, and abet. But, as a matter of course, it does bear upon the question of Scott's telling the truth. Your view on that matter does bear on that question.

"And, first, let me say to you on that question what I said to the other jury, that you start out assuming that Scott is a discredited witness. The law considers when he testifies to the part he took in the transaction he thereby discredits himself, and you are not to believe him, unless you consider, either from his manner of testifying, and from the number of details, the number of particulars which he mentions, of which you are to judge, that he could not have manufactured them ; and from the circumstances which you regard as corroborating him. You are to judge from all these whether he has told the truth or not. If he be a lying witness, one that cannot be relied on under any circumstances, still, if all these things, taken together, that is, his manner, the number of details and other circumstances that point to the defendant corroborating him—if all these circumstances bring conviction to your minds that, whether liar or not, he tells the truth in this case, in so far as the guilt of the defendant is concerned, the law says you can act on it. The law says if it be not corroborated in the important material matters, you should be very cautious about trusting his testimony. The law says it is unsafe to trust his testimony, unless from all the circumstances

of the case you are reasonably satisfied that he has told the truth.

Well, now, bear in mind that the question of who shot makes no legal difference in the case. Then the question for you to decide is, was this defendant present there, either doing the shooting or on the watch helping or encouraging the others? Well, you recollect Scott's story. He says he was employed by James to get the other men to come into this matter; that he got defendant, and defendant got Bob Arthur, and that they three contrived the matter under the management of Mr. James. Now, first, Scott admits that he was there, but he does not admit that he did the shooting. It is said that you are not to believe that he tells the truth on that account; you are not to believe he tells the truth, because it is more likely he did the shooting. You are to be the judges of that. If he was the person who arranged the whole matter, and if he got Lewis Williams, and Lewis Williams got Bob Arthur to join in this matter, it is for you to say for yourselves, according to your own common sense and knowledge of such things, what is the position he would be likely to take, if he was the captain. He says that he stood about half way between the gate and the parties who were to do the shooting. Well, I don't know whether he would consider that the safer position for himself or not; I don't know. You are to judge whether he thought, as he was the manager, he would not be the best man to watch. Did he or not stay in such position as that he could see anybody coming from the big gate, and at the same time give the alarm to those that were at the house? You must weigh that matter for yourselves. I cannot give you any opinion on it. If, from what he says as to his position, you come to the conclusion that he was in a position to see anybody coming, and at the same time in a position to give the alarm to the others, you will then say, was not that the best position for the captain? He may or he may not be unwilling to trust one of the others to an important position like that. I don't know, it is for you to say.

Well, it is said he is not to believed, because there was but one track there, and therefore it is to be inferred that he had no accomplices. There was but one track. You have heard the testimony of Mr. Harman Howell on that subject. He says all

the ground around the steps was perfectly hard, and that it was
not at all probable that a person in his socks could have made a
track there; that on the left hand as you go in where the
person is said to have stood that shot the old man, you could see
that the ground looked like it had been scraped, not a track, but
the surface stirred.    Whether that would be likely to occur from
the manner in which one would move about when firing a gun, I
do not know; it is for you to judge.    But he said he found no
mark of the foot or track anywhere else within the enclosure,
but going on there was a place where he did see tracks of a stock-
ing foot—of one person in stockings—crossing a sandy place.
Can you or not infer from that that there was but one person
going that way?    That would depend upon whether they would
all run together, or whether they would scatter.    It would depend
upon that.    If they scattered immediately after leaving that
place, then would more than one person cross that narrow sandy
place he described?    That is a matter entirely for your own
judgment.    As far as his testimony is concerned, he does not say
they went together.    He says they came back to the gate.    Lewis
came back and Bob Arthur came back, and there got their shoes,
and they then each went their way.    So much as to there being
but one track found.

"Now, gentlemen, what is his story?    His story is that James
first approached him, and it was at James' request that he ap-
proached Lewis Williams to go there that night; that there was a
hitch about the matter, and that subsequently he and James saw
Lewis Williams again, and then Lewis Williams agreed to join
in the matter and get Bob Arthur.    That is his story.    Is it cor-
roborated?    Mr. Harris says that defendant told him in the
presence of Mr. Truett that Scott had tried to get him to do the
matter and he refused, and that Scott and James together subse-
quently tried him, and he still refused.    Well, if he told Mr.
Harris and Mr. Truett that, if you believe them, their story tal-
lies with what Scott said, excepting the last, namely, that he then
refused.    Scott says he saw him first, that James saw him next;
that when he saw him there was a hitch about it; that when
James saw him it was agreed.    The witness, Harris, says that the
defendant said Scott saw him first, and that he would not have

anything to do with it, and that Scott and James saw him again and he refused, and would not have anything to do with it. Barney Howell says the same thing—that he told him so. Is that corroboration or not? The question is, do you believe those witnesses? Are they credible witnesses? Did he tell them so?

"What next? It gets out that he had been talking about this thing, and the old man and Joe James came to him to ask him about it. Well, there is certainly proof that before the old man was killed things got out; whether true or not true, that he had been talking about it. It does not prove that he had been talking about it, but it proves that this thing had got out that he had been talking about it, and that the old man heard it, and that he had connected Joe James with it. Joe James came along with the old man; I don't know whether to convince his father that he was innocent, or for what purpose he came along. The defendant then denied it. Did he do it or not because Joe James was present? That is a question for you. But he admits on the stand that when he denied it, it was true that Scott, in the name of Joe James, had approached him on the subject; and he did not tell the old man that. That is what he said on the stand. Scott had approached him in the matter, and he did not tell the old man—allowed him to go without warning, without telling him to take care of Scott, or telling him to watch Scott, or anything of the sort—although he admits now on the stand that much, that Scott had approached him in the name of Joe James, and said Joe James would pay him if he would take the old man off.

"Now, what comes next as to corroboration? If this be corroboration of Scott's testimony on a material point, what comes next? Mr. Truett says that on the afternoon of the night when the old man was killed the defendant asked him to take the plow before it was time to knock off; that he told him 'No; it was not time to knock off; to go on plowing. He then said he wanted to go, and asked him to take a turn, that he wanted to go off early, and asked him to take the plow.' He says: 'I told him I would take the plow, but he must not go; he must go to the crib and go to shucking corn.' He says: 'I continued to plow until time to knock off, and when it was time to knock off I

came in and put up the animal, and when I finished putting up the animal supper was called; that the defendant went in and got his supper, took it in his hand, and went off.' What time was that? He said between sundown and dark. That is what Mr. Truett says. Does Mr. Harris corroborate that? Mr. Harris says that it was light enough for him to see; that he went out to the big road, and when he got to the big road he turned to the right. That is what Mr. Harris says. It was light enough for him to see then. That is his description of the time.

"Now, he attempts to prove an *alibi*. What is the law of *alibi?* If an *alibi* be proved perfectly, it is considered a perfect defence, because a man cannot take part in doing a crime if he proves to the satisfaction of the jury that he could not have been there, for he was somewhere else. But what else? Well, the law says it is a dangerous defence; because, if he fails to prove it, he comes in danger of proving something else, that he was somewhere else at the time than the place where he tries to prove he was. What is your impression, from the testimony of the proof of the *alibi* in this case? You will remember what the witnesses say. Mr. Truett says he wanted to go early—much earlier than he went. He and Mr. Harris both say he didn't wait to eat his supper, but went off with it in his hand, and at the time they mentioned. Now, he says he went straight to his wife's house.

"What proof is there as to the time he got to his wife's house? His wife says she had about finished supper when he came. She asked him if he would have supper, he said, 'No, he had taken some already.' When cross-examined she refused to say what time it was. She said she didn't know what time it was—she would not undertake to say what time it was—it was early in the night, but she had no time-piece, and she would not undertake to say what time it was. What time does Henry Joe say it was? He says he went fishing and came home and got his supper, smoked his pipe, then went to defendant's wife's house, and defendant had not got there yet, and that it was late, and that he came a few minutes afterwards. It is for you to say now, is that consistent with his being in a hurry to go in the afternoon, with his starting off with his supper in his hand, and his going straight to his wife's house? If it is not, then the question is, what

effect does his attempt to prove an *alibi* for that intervening time have on his defence? That is a question for you. You must decide that; I simply bring your attention to the testimony. He attempts to prove an *alibi*; if he fails to do it, what account does he give of the intermediate time? Where was he?

"You have heard the evidence of the witness who gave an account of how he behaved afterwards; of his leaving his plow. What impression does that make on your mind? You are to decide that. He comes to Darlington on Saturday, and when he went home on Saturday what does he do? He goes to his wife's house, and his wife not being there, he goes over to the house of William Scott on Saturday night. Now, that is the house of the person he was not on good terms with. He finds there another person that he says was the brother of Bill Scott's wife. He asks about his wife, and is told that she left some clean clothes for him. But what more? Then he and Bill Scott, according to his own story, leave the house together. They leave the presence of the person in the house and go to the gate. At the gate he says Bill Scott told him: 'Joe James says you are talking about him. Joe James says you are telling about his wanting to hire you to kill his father, and he says he will see you about it.' He says: 'That is a man I hardly ever see.' (Joe James.) Scott says he said: 'You have been telling Barney Howell and Dr. Wallace.' Scott says: 'My wife says that Isabella McPherson says that Joe James says that you have been telling Barney Howell and Dr. Wallace that he has been trying to hire you to kill his father, and you had better see about it.' That is what Scott, as he says, told him at the gate Saturday night. That is his story. Now, mind you, you have heard that Isabella McPherson is the woman that Joe James kept at Scott's house, she having moved from that place to another house.

"He goes back to Harris's, and Sunday morning Mr. Harris says that after coming in he left soon without his breakfast. He says he went to see one John Hines, that that is what he was absent for on Sunday morning. He tells his testimony on the stand in chief and nothing is said—he never says one word about going to Harman Howell's that morning. He gives his testimony in chief, accounts for where he had been, and never says a

word about being at Harman Howell's.   He is cross-examined by the solicitor, and is questioned about his whereabouts on Sunday morning, and in that examination not a word is got from him about his being at Harman Howell's that morning, not until the court interposed and asked him the question did he then tell the story about seeing Joe James at Harman Howell's on Sunday morning.   When the court interposed, questioning him about that, he said that he had gone there; that he called Harman Howell to the gate and told him his business; that Harman Howell called Joe James, and after awhile Joe James came, and he says there in the presence of all of them: 'I told him that I had heard that he had heard that I had been telling Barney Howell and Dr. Wallace about his wanting to hire me to kill his father', and I had told them no such thing, and that I wanted him to go with me and clear it up.'   Joe James said: 'No, never mind; if I hear any more about it, then I will go.'   He· says: 'I said to him, 'No, get in your buggy and let us go and let us clear it up.'   Joe James said: 'No, let it alone; but if I hear any more of it, then I will clear it up.   Then I will see you about it.'   That occurred on Sunday morning after defendant came here on Saturday,. and after he heard the talk on the road, in which Joe James said something about his being in the shade. That occurred on Sunday morning.

I ask you to account to yourselves why he, after telling Bill Scott on Saturday night that Joe James was a man he hardly ever saw, why he should have been so anxious on Sunday morning to go over there and clear that matter up with Joe James? What motive had he?   Why did he wish to put an end to the story against Joe James—that Joe James had hired him?   Why did he desire to kill that rumor against Joe James about his hiring him to kill his father?   Was it because—you are to say— was it because of any connection he had with Joe James that was important to him?   Was it because of any particular interest in Joe James, a man he hardly ever saw, to take him there that morning?   Well, if Scott tells the truth, that he was to get two hundred dollars, if that was the case, then you may know what took him there.   But you are not to assume that to be true until you find Scott corroborated in other matters.   If Scott tells the

truth, you can well suppose why he was anxious to clear up that
in order to get his money.    If Scott does not tell the truth, then
why was he anxious to clear up that matter next morning with
Joe James ?    Those are questions for you ;  you must account for
them ;  you are bound to weigh them.    You are bound to weigh
all, and account for them ;  and in weighing them all your inquiry
is, do they, or do they not, corroborate Scott ?    Because the law
is, that if you can  reasonably  account for these circumstances,
consistent with  his innocence, then it is not corroboration ;  but
if you cannot reasonably account for them, then they do corrobo-
rate his evidence.

"Well, the Sunday morning passes ;  he is at the prayer-meet-
ing that night;  sees Scott;  Monday morning he goes back, and
you have heard the account of how he left the plow ;  how he per-
suaded Truett to take a turn in the field for  him, and  to  plow a
round for him ;  and then of his disappearance ;  and  you have
heard what the witnesses say about his being tracked down be-
hind the kitchen.    One of the witnesses says that the tracks
looked as though he was running, but he disappears and never
came back.    He disappeared, where ?    Well, it is claimed for
him that he disappeared and went to a place on the public road,
where he would be more likely to be discovered than at Harris's.
That is the claim.    Well, that is a matter for you to consider ;
and you are to consider whether that fair inference can be drawn
from it.    You are to remember that the place on the public road
was not very far from Scott, and where he could have subsequent
communications with Scott, so that they might communicate to
each other whether there was danger ahead or not ;  whether there
was danger brewing.  . You will also  consider whether that place
on the public road was, or was not, the best place to be on the
watch whether there were any officers about the country.    From
my view, you are not, in trying a case of this sort, to assume
that a party that is charged is playing the fool ;  that he is doing
things for nothing, without a motive.    What motive did he have
for leaving Mr. Harris ?   Has he assigned any motive for leaving
Mr. Harris ?   If he has assigned no motive, then you will say
what was his motive.    You must judge of the whole matter.    It
was not far from the public road and Scott's, and would he, in

that position, be in the safest place? That is, could he not have quicker telegraphic communication with each other as to danger brewing, and could he watch for Scott and could Scott watch for him? I don't know that that was his motive; I do not say.

"Furthermore, about that *alibi.* If he went to his wife's house that night, did he get there at an hour which would have allowed him time to have done the deed, and then get there, and get there very soon after? You are to consider the question whether he was then laying the foundation to prove an *alibi.* If you think he has failed to prove it, you are to consider whether he was laying the foundation for an *alibi.* You are to judge of these according to your common sense and according to all the circumstances of the case.

"Now, gentlemen, I know of nothing more that I need call your attention to. Mr. Northcutt, who arrested him, says that he submitted quietly, and did not ask what they arrested him for. He says he thought they were arresting him about something he did over at Mr. Harris's. What had he done at Mr. Harris's, to be arrested for? That is his account. He was arrested and taken where Scott was, and there they were both tied, and never once did he ask, 'What am I arrested for?' 'Who charges me with anything?' 'What have I done?' Weigh all these circumstances, and having weighed them all, then say is Scott's story so corroborated as that we are satisfied, and that without reasonable doubt, that defendant either shot that gun, or was there aiding and abetting; that he took part in this matter. If you are so convinced of that, as that your minds are made up on the subject to a reasonable certainty, then it is your duty to say 'Guilty.' And if your minds are not made up to a reasonable certainty, it is your duty to say 'Not guilty.' "

DEFENDANT'S EXCEPTIONS.—"I. Because the presiding judge erred in overruling the said defendant's challenge *for cause* of all the jurors who had served upon the jury in the case against Joseph W. James, who was charged as a co-conspirator with defendant, and who was convicted; and in allowing three of said jurors to be sworn when the defendant had been forced by his honor's ruling to challenge said jurors peremptorily, his peremptory challenges being then exhausted.

"II. Because his honor erred in charging the jury as follows: 'Well, first, you are not to try whether Lewis Williams shot that gun, or who shot it. That is not a material issue in the case, in so far as his legal guilt is concerned. It is a question when you come to consider William Scott's testimony, but it is not one of the legal issues in the case; because the law is this: that whether he shot the gun, or whether he was on the watch—present on the watch—it is "just the same." ' And in further charging: 'So you will not try that issue at all. You are to try whether he took part in that killing, either by shooting the gun or by being on the watch; being there to encourage, aid, and abet;' his honor thus excluding from the jury's consideration material facts and circumstances negativing the whole contention on the part of the State, that the defendant himself did the killing, and showing that Scott fired the gun; and suggesting to the jury something which the testimony did not even hint at, viz., that the defendant was *on the watch.*

"III. Because his honor erred in that after charging the jury that 'You start out assuming that Scott is a discredited witness. The law considers, when he testifies to the part he took in the transaction, he thereby discredits himself, and you are not to believe him, unless you consider, either from his manner of testifying and from the number of details, the number of particulars which he mentions, of which you are to judge, that he could not have manufactured them, and from the circumstances which you regard as corroborating him,' among other instructions, and after rehearsing Scott's testimony, and asking the question, 'Is it corroborated?' he proceeds to rehearse and detail the testimony in a style at once argumentative and convincing, leaving no room for doubt that his honor regarded his testimony corroborated in material particulars; his honor thus intimating, most transparently, to the jury his opinion upon a very vital question of the testimony.

"IV. Because his honor prejudiced the defence of *alibi* set up by the defendant, and discredited his testimony, in that, after charging as follows: 'Now, he attempts to prove an *alibi.* What is the law of *alibi?* If an *alibi* be proved perfectly, it is considered a perfect defence; because a man cannot take part in doing

a crime if he proves to the satisfaction of the jury that he could not have been there, for he was somewhere else. But what else? Well, the law says it is a dangerous defence, because, if he fails to prove it, he comes in danger of proving something else, that he was somewhere else at the time than the place where he tries to prove he was. What is your impression, from the testimony, of the proof of the *alibi* in this case? You will remember what the witnesses say'—his honor proceeds in an attempt to show the uncertainty of the testimony as to when defendant arrived at his wife's house, and then charges as follows: 'It is for you to say now, is that consistent with his being in a hurry to go in the afternoon, with his starting off with his supper in his hand, and his going straight to his wife's house? If it is not, then the question is, what effect does his attempt to prove an *alibi* for that intervening time have on his defence? That is a question for you; you must decide that. I simply bring your attention to the testimony. He attempts to prove an *alibi;* if he fails to do it, what account does he give of the intermediate time? Where was he?'

"V. Because his honor, throughout his charge, manifested that he had no confidence in any of the defences of which the defendant was seeking to avail himself, and that he had failed to establish them.

"VI. Because his honor intimated his opinion of the defendant's conduct, in that, after charging the jury as follows: 'You have heard the evidence of the witness who gave an account of how he behaved afterwards; of his leaving his place. What impression does that make on your mind? You are to decide that. He comes to Darlington on Saturday, and when he went home on Saturday, what does he do? He goes to his wife's house, and his wife not being there, he goes over to the house of William Scott on Saturday night. Now, that is the house of the person he was not on good terms with,' and after rehearsing a conversation between Scott and defendant, charges the jury as follows: 'He gives his testimony in chief, accounts for where he had been, and never says a word about being at Harman Howell's. He is cross-examined by the solicitor, and is questioned about his whereabouts on Sunday morning; and in that examination not a word

is got from him about his being at Harman Howell's that morn-
ing; not until the court interposed, and asked him the question,
did he then tell the story about seeing Joe James at Harman
Howell's that morning.' His honor thus, in this and other por-
tions of his charge, throwing discredit upon defendant's testi-
mony.

"VII. Because his honor erred in charging further, upon
defendant's conduct, as follows: 'I ask you to account to your-
selves why he, after telling Bill Scott on Saturday night that Joe
James was a man he hardly ever saw, why he should have been so
anxious on Sunday morning to go over there and clear that mat-
ter up. with Joe James? What motive had he? Why did he
wish to put an end to the story against Joe James—that Joe
James had hired him? Why did he desire to kill that rumor
against Joe James, about his hiring him to kill his father? Was
it because—you are to say—was it because of any connection he
had with Joe James that was important to him? Was it because
of any particular interest in Joe James, a man he hardly ever
saw, to take him there that morning? Well, if Scott tells the
truth, that he was to get two hundred dollars, if that was the
case, then you may know what took him there. But you are not
to assume that to be true until you find Scott corroborated in
other matters. If Scott tells the truth, you can well suppose why
he was anxious to clear that up to get his money. If Scott does
not tell the truth, then why was he anxious to clear up that mat-
ter next morning with Joe James?'

"VIII. Because his honor erred, after stating to the jury the
defendant's claim, that inasmuch as he was on the public road
after he left Harris's, where he was more likely to be discovered,
an inference was to be drawn in his favor, in suggesting that 'the
place on the public road was not very far from Scott's, and where
he could have subsequent communication with Scott, so that they
might communicate to each other whether there was danger ahead
or not; whether there was danger brewing;' in suggesting to the
jury that Scott and defendant could have quicker telegraphic
communications with each other; and in charging the jury:
'From my view, you are not, in trying a case of this sort, to as-
sume that a party that is charged is playing the fool; that he is

doing things for nothing, without a motive,' his honor thus, in most unequivocal terms, intimating his opinion to the jury that defendant's conduct indicated guilty knowledge, and that he was seeking to avoid arrest.

"IX. Because his honor erred in charging the jury, in relation to the defendant's conduct, as follows: 'Mr. Northcutt, who arrested him, says that he submitted quietly, and did not ask what they arrested him for. He says he thought they were arresting him about something he did over at Mr. Harris's. What had he done at Mr. Harris's to be arrested for? That is his account. He was arrested and taken where Scott was, and there they were both tied, and never once did he ask, "What am I arrested for?" "Who charges me with anything?" "What have I done?"'

"X. That his honor, in his charge, gave undue prominence to those facts which tended to establish defendant's guilt, and threw discredit upon the testimony of defendant, and used the testimony which came from the mouths of his own witnesses, in his charge, in such manner as had a tendency to condemn him.

"XI. Because his honor, throughout his charge, clearly intimated that he had no confidence in defendant's testimony; that his conduct was suspicious; that he was guilty and should be convicted.

"XII. Because the charge of his honor, when read as a whole, was repugnant to article 4, section 26, of the Constitution of South Carolina.

"XIII. Because of error in his honor in ordering J. A. Huggins, a juror, to stand aside without challenge or objection by the defendant or the State, and before said juror was presented to the defendant."

The questions involved are: First. Did his honor err in his rulings on the matter of empanelling the jury, to wit: in not sustaining defendant's challenges to the jurors who had tried the case of the *State* v. *James*,[1] with whom the defendant had been jointly indicted for the same offence for which he was about being put upon his trial, and for which James had just been convicted,

[1] *Ante,* page 219.

and also for allowing three of said jurors to be empanelled, the others having been excluded by the peremptory challenges of the defendant, which right he had exhausted when the three mentioned were presented? Second. Did his honor err in directing, on his own motion, without challenge or examination, J. A. Huggins to stand aside. and before he was presented as a juror to the defendant? Third. Did his honor charge upon the facts, in violation of the constitutional inhibition upon that subject, in one or more of the particulars indicated in the exceptions?

We have found no direct authority in conflict with his honor's ruling in the matter of the jurors who were of the jury which tried the case of James. True, it is laid down in *Bishop's Criminal Procedure*, §§ 773. 774 (where he discusses the case of jurors who had passed upon the same question while serving in some other capacity), that a grand jury man, who had served on the jury which indicted the prisoner, could not afterwards serve on the petit jury which tries him. This, says Mr. Bishop, was not only so at common law, but was also the rule by statute in England; which statute, as said by Mr. Hawkins, was "in affirmance of the common law." And Mr. Hawkins adds. that "this exception against a juror, that he hath found an indictment against a party for the same cause, hath been adjudged good, not only upon the trial of such indictment, but upon the trial of another indictment or action wherein the same matter is either in question or happens to be material, though not directly in issue," &c., &c. See *Bish. Crim. Proc.*, section 774.

The principle under which a grand-jury man should be excluded, as above, comes very near being applicable here, and but. for our act of assembly on this subject, section 2261, General Statutes, I would be disposed to extend it, or rather to apply it to facts like these in the case before us. Every man before conviction is presumed to be innocent, and he has a constitutional right to an impartial trial before and by an impartial jury. The general assembly, however, of this State has passed an act. looking to this very matter of an impartial jury. General Statutes, § 2261, *supra*. That act provides: "That the court shall, on motion of either party in suit, examine on oath any person who is called as a juror therein, to know whether he is related to

either party, or has any interest in the cause, or has expressed or formed an opinion, or is sensible of any bias or prejudice therein, and the party objecting to the juror may introduce any other competent evidence in support of the objection. If it appears to the court that the juror is not indifferent in the cause, he shall be placed aside at the trial of that cause, and another shall be called."

There are certain legal, and therefore necessary, qualifications which attach to every juror, and, of course, when one or more of these are absent, the accused has the legal right to have the juror excluded, and, in addition, the act of assembly, *supra*, furnishes other reasons to the end of securing impartiality, and why a juror may be placed aside and another called. The matter of determining, however, whether a party presented as a juror is obnoxious to the provisions of this act is left to the court, after motion from either side that an examination be had. See *State v. Nance*, 25 S. C., 121 ; *State v. Coleman*, 20 *Id.*, 450 ; *State v. Dodson*, 16 *Id.*, 460. The required examination took place below, and his honor held that the jurors were not incompetent. We cannot say, under the light of the cases *supra*, that this was legal error.

When J. A. Huggins was called, his honor ordered that he should not be presented to the defendant, stating that he heard his testimony in the other case, and that he did not regard him as a person without prejudice, and that he was not at all satisfied with his talking with the witnesses at the hotel door. We do not know upon what legal principal this was done. It is true, as we have said, that an impartial jury should be had. This is essential both for the State and for the prisoner, and the general assembly has enacted a law to that end—General Statutes, § 2261, *supra*. This act provides the mode and manner by which the question of prejudice shall be determined, with the right to either side upon motion to have it applied. We think it was error for his honor to act without applying this legal test. If one juror could be thus ruled out, why not the whole panel ? No doubt there was sufficient cause for the exclusion, and no doubt had the legal test been applied, Huggins would have been ordered

out; but the act provides the mode and manner, and it should have been adopted.

The other exceptions raise questions upon the charge of his honor, alleging violations of article IV., section 26, of the Constitution, which provides "that judges shall not charge juries in respect to matters of fact, but may state the testimony and declare the law." This court has in several cases announced its understanding of the meaning and intent of this section, which in brief is as follows, to wit: while the judges may state the testimony, they cannot legally indicate their opinion, either expressly or impliedly, intentionally or otherwise, as to the credibility of the witnesses, or as to the truth of any fact in issue, and the subject of the evidence. They may declare the law fully and freely, but whether a certain contested fact has been proved is entirely for the jury, which involves both the credibility of the witness and the existence of the fact, whether said fact depends upon direct and positive testimony or upon inferences to be drawn from other proved facts. In fine, the whole matter of finding the facts of the case must be left entirely to the jury, without suggestions or leadings by the court.

Now, a copy of the charge is appended hereto, and without going into the consideration of all the exceptions seriately, it is sufficient to say that we are constrained to hold that in our judgment his honor went beyond the constitutional limit, *supra*, as appears both upon reading the charge as a whole and upon an analysis of several of the exceptions, in which the language and arguments of his honor are given; and especially in what he said as to the corroboration of the witness, Scott, as to the *alibi*, as to the conduct of the prisoner in failing to state that he had been at Harman Howell's, until the court interposed and asked him the question directly, in calling upon the jury to account to themselves why the prisoner, after telling Bill Scott on Saturday that Joe James was a man he hardly ever saw, why he should have been so anxious on Sunday morning to go over there and clear that matter up with Joe James; what motive had he—thus assuming certain facts as proved, and suggesting damaging questions thereon in a way which indicated that they could not be accounted for consistently with the prisoner's defence.

But it is needless to encumber this opinion with any further particulars. Upon reading the charge as a whole, we have been impressed with the idea that his honor thought the prisoner guilty and that he should be convicted, and that the language used and the questions propounded for the consideration of the jury, necessarily carried this thought to them ; and therefore a new trial must be ordered. In reaching this conclusion we desire it to be distinctly understood that it is not significant of any opinion by this court upon the guilt or innocence of the accused, and that our judgment granting the new trial should have no influence whatever upon said trial.

It is the judgment of this court, that the judgment of the Circuit Court be reversed, and that the case be remanded for a new trial.

MR. JUSTICE McGOWAN concurred in the result.

MR. JUSTICE McIVER. I concur fully except as to the first question considered. As to that I think the Circuit Judge erred in disallowing the prisoner's challenge to the three jurors who had served on the trial of *The State* v. *James.* I do not think the section of the General Statutes referred to applies, and, on the contrary, am of opinion that the conceded fact that these jurors had just rendered a verdict in a case depending to a great extent upon the same testimony, was a sufficient cause of challenge, without regard to their testimony when examined on their *voir dire.*

Judgment reversed.